IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Phar-Mor, Inc.,                                    Case No. 3:08 CV 855

                Appellant,       MEMORANDUM OPINION
                                 AND ORDER
   -vs-
                                 JUDGE JACK ZOUHARY
McKesson Corporation,

                Appellee.

## INTRODUCTION

This matter is before the Court on an appeal from a Bankruptcy Court Order on cross motions for summary judgment (Doc. No. 1, Ex. 1), in which the Bankruptcy Court granted Appellee McKesson's motion for summary judgment and denied Appellant Phar-Mor's motion for partial summary judgment. The parties fully briefed the issues (Doc. Nos. 20, 27 & 32), and this Court held a hearing on July 7, 2008.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court adopts the factual background from the Bankruptcy Court Order (Doc. No. 1, pp. 2-8). The following is a brief summary.

**Parties**

Phar-Mor was a discount retail drugstore chain with stores concentrated in eastern Ohio and western Pennsylvania. McKesson is one of three wholesalers that distribute prescription pharmaceuticals to national and regional drugstore chains.

**Supply Agreement**

In June 1997, Phar-Mor and McKesson signed a Supply Agreement ("Agreement") in which Phar-Mor agreed to purchase from McKesson substantially all of its prescription drugs and pharmaceutical supplies, with a "purchase commitment" of at least $200 million per year.  McKesson agreed to supply these pharmaceuticals to Phar-Mor at a negotiated price and to extend unsecured credit to Phar-Mor with a period of 22.5 days to pay McKesson's invoices.  The Agreement was conditioned on Phar-Mor maintaining a "sound financial condition."  McKesson reserved the right to change credit or payment terms "if there has been either a material adverse change in Phar-Mor's financial condition or a payment default" (Doc. No. 1, Ex. 1, p. 3).

In November 1999, the parties signed an amended Supply Agreement ("Amended Agreement") extending the terms for an additional four years.  Phar-Mor's annual purchase commitment was increased to at least $300 million, and McKesson agreed to extend the average number of days to pay invoices from 22.5 days to 26.5 days.  McKesson retained the ability to change payment terms or to limit total credit in the event of a material adverse change in Phar-Mor's financial condition.

**McKesson's Request to Change Credit Terms**

In March 2001, McKesson sent a letter to Phar-Mor suspending McKesson's performance under the Amended Agreement unless Phar-Mor agreed to reduced payment terms.  McKesson was concerned about the soundness of Phar-Mor's financial condition and its ability to make future payments because of Phar-Mor's recent Moody's downgrade, its reduced bank line availability, and its general financial deterioration.  On the day McKesson requested a change in Phar-Mor's payment terms, Phar-Mor's stock price had dropped to 81 cents per share, a decline from $3.88 back in

2

November 1999 when the parties signed the Amended Agreement. Phar-Mor accepted the revised terms, under protest, resulting in reduced ability to borrow.

Pursuant to the Amended Agreement, McKesson demanded adequate assurances of Phar-Mor's future ability to perform (Doc. No. 1, Ex. 1, pp. 4-5). Phar-Mor responded in April 2001 with forecasts of its balance sheets, income statements, cash flow, and borrowing availability for the remainder of 2001. The forecasts stated that "Phar-Mor gives no assurance that the Forecasts will be realized, and it is under no obligation to report changes in the Forecasts" (Doc. No. 1, Ex. 1, p. 8). McKesson's credit manager testified that the projections were not a sufficient response and that she made no determination as to whether Phar-Mor's forecasts were credible. In any event, after receiving Phar-Mor's financial information, McKesson did not reinstate the original credit terms.

In September 2001, Phar-Mor filed for relief under Chapter 11 of the Bankruptcy Code.

**Bankruptcy Court Decision**

Phar-Mor filed an action for damages in Bankruptcy Court, alleging McKesson breached the Amended Agreement, and moved for partial summary judgment on the issue of whether a breach occurred when McKesson changed Phar-Mor's credit terms. McKesson also moved for summary judgment, arguing Phar-Mor experienced a material adverse change in its financial condition as a matter of law and, in any event, Phar-Mor sustained no legally compensable damages as a result of the change in payment terms.

The Bankruptcy Court found "the undisputed facts demonstrate[d] that a material adverse change in Phar-Mor's financial condition occurred and, thus, that McKesson is entitled to summary judgment since it had a contractual right to change Phar-Mor's payment terms" (Doc. No. 1, Ex. 1, p. 9). The court based its opinion on its assessment of the plain meaning of the terms "financial

3

condition" and "material adverse change," which it gleaned from surveying definitions of these phrases in various dictionaries, as well as evaluating the terms in the context of the agreements and the parties' conduct. The Bankruptcy Court determined that a reasonable person in McKesson's position would have deemed Phar-Mor's cumulative financial decline in the months preceding March 2001 to be evidence of a "material adverse change," thereby entitling McKesson to restrict the credit terms. The Bankruptcy Court did not address McKesson's alternative argument regarding Phar-Mor's lack of resulting damages from the change in payment terms.

## DISCUSSION

### Standard of Review

This Court reviews the conclusions of law *de novo*; findings of fact are reviewed for clear error. *In re Commonwealth Institutional Sec.*, 394 F.3d 401, 405 (6th Cir. 2005). Pursuant to Federal Civil Rule 56(c) (applicable to this proceeding by Federal Bankruptcy Rule 7056), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Furthermore, interpretation of a contract is a question of law subject to *de novo* review. *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 577 (6th Cir. 2006) (*quoting Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996)).

**Issues on Appeal**

Though Phar-Mor lists five main points in its appeal, its arguments can be reduced to two main issues: whether the Bankruptcy Court incorrectly (1) analyzed the phrase "financial condition" to determine that Phar-Mor had suffered a material adverse change; and (2) concluded as a matter of law that Phar-Mor experienced a "material adverse change" in its financial condition. The Court will consider each of these arguments in turn.

**Analysis of "Financial Condition"**

Phar-Mor argues the Bankruptcy Court erred in defining "financial condition" to mean "the state of a company's pecuniary affairs or resources." Instead, Phar-Mor believes a determination of its "financial condition" should be strictly limited to an analysis of its balance sheet and liquidity (Doc. No. 20, p. 3).

Instead of relying on a survey of dictionary definitions to determine how "financial condition" should be construed within the context of the Amended Agreement, as the Bankruptcy Court did, this Court believes the Amended Agreement and the parties' conduct supply the required definition. "[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instruments." *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St. 2d 241, 246-47 (1978).

The Amended Agreement was expressly conditioned on Phar-Mor maintaining a sound financial condition. McKesson reserved the right to change payment terms under Paragraph Nine of the Amended Agreement. Importantly, the language was negotiated so that the determination of a material adverse change in Phar-Mor's financial condition could not be decided by McKesson in its

5

"sole discretion" (Doc. No. 1, Ex. 1, p. 3). The parties intended that a more objective standard be applied and agreed on the following language:

> This Agreement is conditioned upon Phar-Mor's maintaining a **sound financial condition** throughout the term hereof and to that end, Phar-Mor agrees to promptly substantiate in writing, at McKesson's request, the existence of such condition with **publicly available financial and other publicly available supporting information** reasonably requested by McKesson.
>
> McKesson reserves the right to change a payment term or limit total credit if there has been either a **material adverse change in Phar-Mor's financial condition** or a payment default based on the payment terms and conditions specified in this Agreement which remains uncured for more than ten (10) days following notice of such payment default to Phar-Mor by McKesson. Upon the occurrence of either such event, McKesson may require cash payment or appropriate security before shipment of any further Merchandise to Phar-Mor. **In the event of such changes by McKesson, Phar-Mor may terminate this Agreement on ten (10) days written notice to McKesson**. Any such termination will not be considered a default under this Agreement subject to the payment of damages . . . .

(Doc. No. 1, Ex. 1, p. 3) (emphases added). Thus, while McKesson reserved the right to change payment terms, Phar-Mor subsequently reserved the right to terminate the Agreement if the changed terms were unacceptable so Phar-Mor could seek other supply sources for its inventory. Essentially, the Amended Agreement represented an ongoing relationship between the parties with the ability to monitor McKesson's risk of repayment through extension of credit to Phar-Mor.

The Amended Agreement's language specifies that Phar-Mor must maintain a "sound financial condition" and, to that end, must support such condition with "publicly available [] information." Clearly, the Amended Agreement contemplates that McKesson may consider a broader universe of information than the narrow interpretation Phar-Mor favors.

Phar-Mor further argues the phrase "financial condition" has a particular meaning in financial and accounting fields, limited to only the balance sheet and S.E.C. filings. While a balance sheet is

6

an important part of a company's financial condition and helps determine its ability to generate cash and pay debt, it is not the only factor.

The Amended Agreement is governed by Ohio law and, in particular, Ohio's version of the Uniform Commercial Code (Doc. No. 1., Ex. 1, p. 3). Ohio Revised Code § 1302.05(A) states that the terms of a contract "may be explained or supplemented by course of dealing or usage of trade." "Usage of trade" is defined as "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." R.C. § 1301.11(B). There is no testimony from the individuals who negotiated the Amended Agreement that a narrow definition was intended. Nor is there any testimony from a representative of the retail pharmaceutical industry from which the Court could infer the parties' intent. As the Bankruptcy Court properly found, there is no evidence indicating Phar Mor's technical definition of "financial condition" was to apply. Phar-Mor fails to show such an interpretation was regularly used in the retail pharmaceutical industry so that it should be similarly construed here.

Indeed, Phar-Mor could have included in the Amended Agreement the narrow definition it now advocates. However, the only support for this definition is an expert whose opinion is not based on the retail pharmaceutical industry or on the particulars of this case. As McKesson noted at oral argument, "[w]hether financial condition means one thing to public accountants is interesting, but it doesn't tell us what was in the minds of the people negotiating **this** pharmaceutical agreement" (Tr. 12) (emphasis added). This Court finds that experts for both sides do not offer helpful testimony and that Paragraph Nine of the Amended Agreement better reflects the intentions of the parties.

7

Finally, Official Comment 1 to R.C. § 1301.11 states "the meaning of the agreement of the parties is to be determined by the language used by them and **by their action**" (emphasis added). Thus, perhaps most tellingly, when McKesson did request Phar-Mor substantiate the soundness of its financial condition, Phar-Mor did not limit itself to submitting only its balance sheet and liquidity. Phar-Mor's March 30, 2001 letter to McKesson described, *inter alia*, its margins, share price, and debt capitalization; its April 18, 2001 letter provided "forecasts of Phar-Mor's operations" through the end of 2001, including monthly income statements, balance sheets, cash flow analyses, and borrowing base calculations. Phar-Mor's very actions suggest it believed the indicators of "sound financial condition" stretched beyond merely its balance sheet and liquidity. Similarly, McKesson was correct to consider other publicly available financial sources in determining whether to change the credit terms of its Agreement with Phar-Mor.

**Phar-Mor Experienced a Material Adverse Change**

The remaining issue is whether the Record supports judgment for McKesson as a matter of law on the issue of whether McKesson correctly determined there had been a material adverse change in Phar-Mor's financial condition, and therefore properly changed credit terms.

As stated above, the Agreement permits McKesson to use "publicly available financial and other publicly available supporting information reasonably requested by McKesson" in making a determination of Phar-Mor's financial condition. Clearly, Phar-Mor need not have failed financially prior to McKesson altering the credit terms. At oral argument, McKesson agreed with Phar-Mor that Phar-Mor was not yet in a "default situation" as of March 2001. McKesson rightly noted, however, "that's not the point. The point is you have to look down the road, see what's coming and take appropriate action" (Tr. 60). McKesson concluded that Phar-Mor had suffered a material adverse

8

change in financial condition, and at the time McKesson had ample evidence to support that conclusion.

For example, in October 2000, Global Credit Services reported Phar-Mor's working capital had declined annually from approximately $159 million in fiscal year 1997 to $47 million in fiscal year 2000. Similarly, in November 2000, F&D Reports detailed Phar-Mor's financial decline and uncertain future, pointing to poor cash flow that failed to fully cover Phar-Mor's increasing interest expense for the third straight quarter and a highly leveraged balance sheet. Moreover, in February 2001, Moody's Investors Service and Global Credit Services downgraded all ratings of Phar-Mor, the latter referring to Phar-Mor's operational losses as "internal hemorrhaging" and advising clients to "monitor their exposures and reduce terms and credit lines" (Doc. No. 1, Ex. 1, p. 7).

Even Phar-Mor's balance sheets did not provide a rosy outlook. Preceding McKesson's decision to change credit terms, Phar-Mor's S.E.C. Form 10-K for fiscal year 2000 reported $5.34 million in operating income and a net loss of slightly over $11 million (including an extraordinary gain of $1.1 million from the repurchase of its senior debt). By comparison, in fiscal year 1999, Phar-Mor reported $15 million in operating income and net income of $596,000 (with no extraordinary gain). In November 2000, Phar-Mor filed its S.E.C. Form 10-Q for the first fiscal quarter of 2001, reporting a net loss of $8.5 million and a nearly 3 percent decline in same-store sales as compared to the first quarter of the prior fiscal year. In February 2001, Phar-Mor reported $789,000 in operating income and a loss of $9.25 million for the quarter.[1]

---

[1] These numbers exclude extraordinary gain resulting from the repurchase of senior debt. During December 2000 and January 2001, Phar-Mor repurchased over $40 million of its senior debt at approximately 50 cents on the dollar, as compared to 80 to 90 cents on the dollar a year earlier. Thus, an extraordinary gain of $17.1 million resulted in net quarterly income of $7.84 million.

Though none of these factors alone may constitute sufficient evidence of a material change, when viewed together they corroborate the material change in Phar-Mor's financial condition. Given the totality of the evidence presented -- sharp declines in earnings, credit ratings, bank credit line availability, and stock price, among other indicators -- there were sufficient financial indicators for McKesson to protect itself and change payment terms. The Bankruptcy Court correctly found Phar-Mor had suffered a material adverse change in its financial condition. McKesson did not, therefore, breach the Amended Agreement when it changed Phar-Mor's payment terms.

## CONCLUSION

The Court finds Phar-Mor's interpretation of "financial condition" to be improperly narrow and unsupported by the plain language of the Amended Agreement and Phar-Mor's own behavior. Furthermore, the Court finds Phar-Mor did suffer a material adverse change in its financial condition, and thus the Record sufficiently supports judgment for McKesson as a matter of law on Phar-Mor's breach of contract claim. The Bankruptcy Court Order granting summary judgment to McKesson is affirmed to the extent indicated above.

IT IS SO ORDERED.

      s/ *Jack Zouhary*
    JACK ZOUHARY
    U. S. DISTRICT JUDGE

December 31, 2008